# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ERLEND TANGEN, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 12-0267-CG-M |
| | ) |
| IDEACOM OF THE GULF COAST, INC. | ) |
| | ) |
|    Defendant. | ) |

## ORDER ON BENCH TRIAL

### I. BACKGROUND

Plaintiff Erlend Tangen worked for Defendant Ideacom of the Gulf Coast, Inc., for almost ten years. He started in 2002 as a sales representative (or in Ideacom's parlance, a Healthcare Representative), earning a salary of $33,000 a year. On top of that salary, Tangen earned a 5% commission on sales. At that time, commissions were payable in two equal installments—a front-half payment of 2.5% which was paid when a customer signed a sales contract, and a back-half payment due when the customer paid in full.[1]

In late 2008, Ideacom changed the structure of Tangen's commissions with a one-page written document labeled "Sales Compensation Program." (Pl.'s Trial Ex. 15.) (Because that program was effective for all jobs started

---

[1] The parties dispute what form that agreement took. Tangen says he signed a written contract with Ideacom's president, while Ideacom insists that that contract is a forgery. It is undisputed, however, that Ideacom agreed to pay Tangen commissions as set out above beginning in 2002.

after January 2009, the parties have taken to calling this the "2009 program." The court will follow suit.) Though the 2009 program changed the way commissions were calculated, it did not affect the mode of payment. Tangen still received commissions in front-half, back-half installments. The most significant change was that the back-half payment was no longer fixed at 2.5%; instead, it varied from .5% to 3.5% based on a sale's profitability.

In May 2011, Tangen decided to leave Ideacom for another job. He broke the news of his resignation in a phone call to Ideacom's president, John Robb. At some point during the conversation, the topic of unpaid commissions came up. Robb said that Tangen would lose "a lot of money" in the form of unpaid commissions if he resigned. (Trial Tr. (Doc. 127) 196:12.) When Tangen replied that he had spoken with a lawyer who thought otherwise, Robb "said F. U." and hung up the phone. (Trial Tr. 122:12–13.)

After Tangen left, Ideacom refused to pay back-half commissions on twelve sales that Tangen made before his resignation. Tangen filed this lawsuit to recover those commissions. Although the court granted summary judgment on some of Tangen's claims (see Doc. 101), one of his claims under the Alabama Sales Commission Act, Ala. Code § 8-24-1–5, and all of his claims for breach of contract proceeded to a bench trial held September 10–11, 2013. Since then, the parties have filed post-trial briefs (Docs. 128, 129, 130, 131), and the matter is ripe for decision.

## II. DISCUSSION

**A. Breach of contract**

Tangen's claims for breach of contract require proof of four elements: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. Jones v. Alfa Mut. Ins. Co., 875 So.2d 1189, 1195 (Ala. 2003).

**1. Valid Contract**

Alhough certain phrases in Ideacom's post-trial brief suggest otherwise (e.g., the heading "No Evidence of An Agreement" (Doc. 129 at 8)), there is really no question that the 2009 program was a valid contract binding on the parties; Ideacom readily admits that it was bound by the 2009 program to pay Tangen front-half and back-half commissions if he performed his duties. Instead of denying the existence of the 2009 program as a valid, binding agreement, Ideacom denies only that Tangen performed his obligations under that agreement. Thus, the question is really one of performance.[2]

**2. Tangen's Performance**

Though the parties agree that the 2009 program existed and that it provided for back-half commission payments when certain conditions were met, they disagree on what those conditions were. According to Tangen, he earned back-half commissions by securing sales contracts. Ideacom thinks

---

[2] Based on evidence presented at trial, the court finds that the 2009 agreement modified or superseded whatever arrangement the parties had before then. Accordingly, the terms of the 2002 commission arrangement do not affect the outcome of this case.

3

otherwise, arguing that the 2009 program only provided for back-half commissions to sales representatives who performed certain post-sale duties like overseeing installations and handling customer complaints.

The written language of the 2009 program supports Tangen's interpretation. To begin with, that document's title—"Sales Compensation Program"—suggests that the program was intended to compensate Tangen for, well, making sales. Equally revealing are the terms that are not in the contract. Although Ideacom insists the 2009 program required sales representatives to oversee installations, the program's language does not mention any such duties. Instead, commissions are a simple function of a job's profitability—sales with higher markups yield higher commissions no matter how much or how little time a sales representative spends on post-sale duties. And unlike the agreements at issue in Ideacom's citations to authority, the 2009 program contains no language that expressly conditions back-half commissions on the performance of post-sale duties[3] or provides for the forfeiture of back-half commissions upon resignation.[4]

Beyond the 2009 program's written terms, the course of dealings

---

[3] See, e.g., Chretian v. Donald L. Bren Co., 151 Cal. App. 3d 385, 388 (Cal. Ct. App. 1984) (interpreting a contract in which back-half commissions were earned by "*servicing* the sale transaction through successful close of escrow" (emphasis in original)).

[4] See, e.g., Am. Software, Inc. v. Ali, 46 Cal. App. 4th 1386, 1389 (Cal. Ct. App. 1996) (interpreting a contract that expressly provided that "all commissions which would normally be due and payable are forfeited" after termination or resignation).

4

between Tangen and Ideacom also supports Tangen's interpretation. Tangen testified that for three of the sales listed on his final commissions statement, he was not responsible for oversight and troubleshooting of the installation; that was Ron Schrader's job. (Trial Tr. 313:6–316:7.) Nonetheless, it is undisputed that Tangen earned back-half commissions on those jobs. And in an email to a customer, John Robb said Tangen's role in a sale ended with the presales discussions; other employees were responsible for the "installation and implementation" of Ideacom's products.[5] (Pl.'s Trial Ex. 8.)

Finally, there's the testimony of John Robb himself. When he was asked why he implemented the 2009 program, he did not say anything about compensating his sales representatives for performing their post-sale duties. No, the purpose of the 2009 program was to incentivize profitable sales and accurate quotes:

> Q: . . . And so don't let me put words in your mouth. You tell us why is it that you decided to implement that 2009 program.
>
> A: I lost money in 2008 for the first time since I started business in 1991 and it came to me that some of the jobs seemed to be underquoted. And let's say it was a $50,000 job. They got their 5 percent whether I made money or not. So I did some checking around in the industry and found that this is a common practice, that the salesperson had, as you said earlier, some skin in the game.
>
> * * *
>
> Q: So the 2009 program was your answer to the problems that you were perceiving that you had been losing money on jobs

---

[5] The court gives little weight to Robb's self-serving testimony that he was lying to the customer in that email (see Trial Tr. 109:6–7 ("Q: You lied to her? A: Absolutely."), which reveals little else than Robb's willingness to lie when he stands to lose money.

> after you were able to do a back-end cost analysis and determine
> the profitability of the job; is that fair to say? . . .
>
> A: I guess, yeah.
>
> Q: But in any case, this was your way—let's say your words—to
> make sure the salesman had skin in the game?
>
> A: That's correct.
>
> Q: Meaning that the salesmen really would have less incentive
> to go in and price a job if he or she knew that the total amount of
> commission paid was going to be affected by his or her
> underestimating the job?
>
> A: Correct.

(Tr. at 111:16–112:20.) Thus, Robb's testimony confirms what the other evidence suggests: the 2009 program was meant to compensate sales representatives for making profitable sales, not for performing post-sale duties.

Nevertheless, Ideacom insists that the back-half commission was based purely on post-sale duties. But that interpretation is inconsistent with the 2009 program's payment structure. If the front-half commission was really intended to be the sales representative's full compensation for making a sale, then it doesn't make sense that the front-half commission was fixed at 2.5% no matter how profitable the sale turned out to be. And if the back-half commission was intended to compensate sales representatives for performing post-sale duties, it is unclear why post-sale duties are not a factor in the calculation for back-half commissions. Faced with a similar payment structure, the Alabama Court of Civil Appeals found that commissions were

6

earned by making sales, not performing post-sales duties.[6] This court reaches the same conclusion here.

Nor does the testimony of Doug Tomberlin, who was also subject to the 2009 program, support Ideacom's interpretation. Though Ideacom insists that back-half commissions are earned by staying on the Ideacom team until a customer pays in full, Tomberlin said that back-half commissions are earned as soon as a job is billed. The difference is significant because Tangen claims he is owed commissions on several jobs that were billed but not paid in full at the time he resigned.

And finally, Ideacom's least persuasive argument is that the job description it wrote in Tangen's visa renewals somehow formed a term of the 2009 program. Even assuming that Tangen continued to be responsible for every job duty listed in those applications over the course of his career at Ideacom, that wouldn't mean that all those duties were tied to his commission payments. Tangen earned a salary of nearly $1,000 a week. (Def.'s Trial Ex. 22.) Ideacom presented no evidence that persuades the court that the post-sale duties listed in Tangen's visa renewals were tied to his commission payments rather than to his salary.

Cumulatively, the 2009 program's written language, the course of

---

[6] See Creative Leasing, Inc. v. Cannon, 496 So. 2d 79, 80–81 (Ala. Civ. App. 1986) (finding that evidence of a payment structure that varied based on the number of sales made rather than customer complaints handled supported a finding that commissions were earned by making sales, not by performing "collateral" post-sale duties that were "unrelated to compensation").

dealings between Tangen and Ideacom, and the testimony given at trial leave the court with little doubt that the 2009 program was intended to compensate Tangen for making sales. Accordingly, the court finds that Tangen earned his commissions—both front- and back-half—by making sales.

With that question settled, the issue of performance becomes simple. Ideacom admits that Tangen made the sales he wants back-half commission on,[7] and the parties have stipulated that the customers on those sales have all paid in full. Thus, Tangen earned back-half commissions on those sales under the 2009 program, and the court finds that he has proved the performance element of his claims for breach of contract.

### 3. Ideacom's Nonperformance

It is undisputed that Ideacom never paid Tangen the back-half commissions he is due on the sales at issue in this lawsuit. Accordingly, Tangen has proved Ideacom's nonperformance.

### 4. Damages

All that is left is to calculate damages, which is a simple matter of calculating the final markup on each job at issue and awarding Tangen back-half commissions in accordance with the 2009 program's terms. With respect to six of the commissions at issue, Tangen has done the math and the results

---

[7] Because Tangen made those sales *before* he resigned, there is no need to discuss the law on post-resignation commissions, which deals with commissions due on sales made *after* a sales representative's resignation. See, e.g., Lindy Mfg. Co. v. Twentieth Century Mktg., 706 So. 2d 1169, 1175 (Ala. 1997) (holding that a sales representative was entitled to commissions on certain sales that were made after the termination of a sales contract).

are undisputed.[8]

With respect to the remaining six commissions, however, Tangen says it was "impossible . . . to calculate his second-half commissions" because Ideacom did not keep accurate records of its costs on those jobs. (See Doc. 128 at 10.) But the "impossible" calculations Tangen shied away from attempting are simple enough. According to the 2009 agreement, Tangen is entitled to back-half commissions of 3.5% on all sales with a markup "[a]bove 2"—i.e., sales with a markup greater than 200% of the job's cost. (Pl.'s Trial Ex. 15). On the six jobs for which Ideacom refused to put on any evidence of cost,[9] the court has no choice but to find that Ideacom incurred no costs. Thus, at least so far as the evidence shows, the revenue on those jobs far exceeded 200% of their costs, so Tangen is entitled to 3.5% back-half commissions on those jobs.

Accordingly, the court finds that Tangen has proved damages on his breach-of-contract claims in the total amount of $106,407.96. (See Doc. 128-1

---

[8] Tangen used Ideacom's own records (Pl.'s Trial Exs. 12A–D) to calculate the commissions due to him on the jobs at DCH/CSICU, Mt. View, Cross Bdg, and Lakeland Psych. And at trial, Ideacom admitted that Tangen earned the amounts he is claiming on the jobs at Noland and DCH Laundry. (See Doc. 129 at 11–12.)

[9] Although Ideacom put on some evidence of its costs on some of those jobs (e.g., John Robb's testimony that Ideacom spent "I don't know . . . . a couple of thousand dollars" obtaining a technical certification required for one job (Trial. Tr. 124:20)), there was no evidence of any costs in a sum certain that the court can factor into the markup equation.

9

calculating damages based on assumptions consistent with the court's findings[10]).)

**B.    Sales Commission Act**

Tangen's only claim under the Alabama Sales Commission Act, Ala. Code § 8-24-1–5, involves the sale he made to Griffin Electric. For the reasons discussed above, the court has already found that Ideacom failed to pay Tangen the back-half commission he is due on that sale. But his claim under the Sales Commission Act also requires proof that that sale was made at the wholesale level. See Ala. Code § 8-24-1(3).

Tangen has met that burden. The invoice for the Griffin Electric sale shows that the products Tangen sold were delivered to "Mt. View Nursing Home and Rehab CRT" in Birmingham. (Pl.'s Trial Ex. 2(f).) There was testimony from Ideacom's president that shows the products were installed at Mountain View and suggests that Mountain View was "the customer" in that job. (Trial Tr. 105:14–106:21.) On direct examination, Tangen explained that he sold the product to Griffin Electric, who in turn sold the product to Mountain View, the end user. (Trial Tr. 190:3–21[11].) And even without any of that testimony, the invoice itself supports the obvious inference that Mountain View, a nursing home, was the end user of the medical equipment

---

[10] Ideacom did not object to the accuracy of these calculations.

[11] To the extent this testimony might have relied on hearsay rather than Tangen's first-hand knowledge, Ideacom failed to timely object.

Tangen sold, not Griffin Electric, an electric company.

Accordingly, the court finds that Tangen's claim under the Sales Commission Act involved a wholesale transaction, which means he is entitled to damages in the amount of $4,092.74.[12] By statute, he is also entitled to reasonable attorney's fees and costs. Ala. Code 8-24-3.

### III. CONCLUSION

Accordingly, the court finds that judgment is due to be entered in Tangen's favor in the total amount of $110,500.70, plus reasonable attorney's fees and costs, as follows:

(1)   On Count I in the amount of $106,407.96; and

(2)   On Count II in the amount of $4,092.74, plus reasonable attorney's fees and court costs.

It is further **ORDERED** that Tangen shall submit an itemized list of the attorney's fees he is claiming, along with supporting documentation, on or before November 14, 2013. Ideacom may file a reply on or before November 21, 2013.

**DONE** and **ORDERED** this 31st day of October, 2013.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE

---

[12] According to Tangen's math, Ideacom's revenue on the products sold to Mountain View was $81,854.82. (Doc. #128.) At a 2.5% commission rate (which is based on Ideacom's markup calculation), Tangen was due a commission of $2,046.37 for the products he sold on that job. At the Sales Commissions Act's treble-damages rate, that means Tangen is due $6,139.11, which the court reduces by a third to reflect the $2,046.37 of that amount included in Tangen's recovery for breach of contract.

11